Missouri, Kansas & Texas Railway Company et al. v. R. L. Cook.

No. 1412.

### 1. Passenger—Riding in Stock Car—Contract—Waiver.

See contract that shipper riding with his stock should remain in caboose or assume the risk of injury if he left it, under which evidence that he was permitted by the conductor without objection to ride in the car with his horse, and that such was the custom was held properly admitted to show waiver by the railway company of such provision in the contract. (Railway v. Cook, 8 Texas Civ. App., 376, adhered to.)

### 2. Passenger Carrier—Degree of Care.

Where charge only required of a railway company the exercise of ordinary care in transporting passengers it was not error to refuse a charge requested by the company, limiting the care demanded of a carrier to the highest degree consistent with the practical operation of its trains.

### 3. Negligence—Charge on Particular Facts.

See case for charge, on duty of conductor to warn passenger riding in stock car with his horse, the train having been stopped by accident, of the danger of impending collision with following train, held not objectionable because a charge on the evidence, nor because giving too much importance to particular evidence, nor as making supposed state of facts negligence in law.

### 4. Same.

See case for facts under which a charge,—relieving railway company from liability for collision if caused by accident preventing brakeman from getting back in time to flag following train,—was properly refused, the evidence not justifying a special charge on the theory that such accident was the sole cause of the collision.

Appeal from Williamson. Tried below before Hon. F. G. Morris.

*West & Cochran*, for appellants.—1. The plaintiff being the first witness in his own behalf, having testified that before beginning the journey from Dallas to Temple, he entered into a written contract with the railroad company for the shipment of his horse, the court should have excluded all testimony bearing on the question of what other shippers did in transporting race horses over the defendant's line of railroad, because by the terms of the contract, the plaintiff bound himself to ride in the caboose car attached to the train, and agreed to assume all risk of riding elsewhere. The contract thus expressly permitting the plaintiff to ride elsewhere than in the caboose car, at his own risk, it was immaterial to the issues of the case, and prejudicial to the rights of defendants, to permit testimony as to what others had done while their race horses were being carried under the same form of contract.

2. As the contract by its express terms permitted the plaintiff to ride elsewhere than in the caboose at his own risk of personal injury, it was improper for the court in the seventh paragraph of its charge to instruct the jury, notwithstanding the express permission given in the contract, that it was claimed by plaintiff that after the contract was made, and at the beginning and during the plaintiff's journey and prior to the collision between the trains, the conductors in charge of the trains, who he claims had authority to so do, waived said provision in the contract, and permitted plaintiff to ride in the stock car containing his horse.

This charge was positively erroneous, because as shown by the language used, the facts recited therein as to custom or practice of other persons in exercising the permission contained in the contract, was the only evidence before the jury as to a waiver of the contract provision, requiring plaintiff to ride in the caboose. There is no claim or contention shown in the charge that in availing himself of this permission, the plaintiff and the conductors ever discussed or considered the other provision, requiring the plaintiff to ride in the caboose. Appellants' contention is that as the contract expressly gave permission to plaintiff to do what he did in riding in the car with his horse, the question of waiver of the other provision could not arise without some direct negotiation with reference to the matter of riding in the caboose. In other words, the practice of riding elsewhere than in the caboose, being authorized by the contract, could not be considered for any purpose as waiving the other provision of the contract in reference to riding in the caboose, because the contract provided that plaintiff should assume the additional risk of riding elsewhere; and, therefore, if he, or any number of other persons chose to exercise this option, this could not affect the question of contributory negligence on his or their part in so riding elsewhere. We submit that the charge of the court is in direct conflict with the terms of the contract, and practically eliminated the question of contributory negligence, or what amounts to the same thing, the additional risk incurred in riding elsewhere than in the place provided for the transportation of passengers who may ride upon freight trains.

3. The court, instead of giving the seventh paragraph of its charge, should have given defendants' first special charge, correctly construing the contract according to its terms, as follows: "The jury are instructed that the legal effect of the provisions of said contract required plaintiff to remain in the caboose, and that if he saw fit to ride in the car with his horse he could do so; but if from the evidence the jury believe that the riding in the car with his horse was more dangerous than in the caboose car, then, in so riding, plaintiff assumed the increased risk; and if you believe from the evidence that if plaintiff had remained in the caboose car he would not have been injured, you will find for defendants on the issue of personal injuries to himself." Railway v. Clemmons, 55 Texas, 88; Railway v. Boyd, 6 Texas Civ. App., 211.

4. The error of the court in misconstruing the contract, as contended for in the second assignment, is continued, and the error repeated by the court in the eighth and ninth paragraphs of its charge, because, as stated before, there was no evidence in the record of any waiver of the requirement that plaintiff should ride in the caboose beyond the fact that he rode elsewhere and that others did. Appellants repeat their contention that this practice was not only not in violation of the terms of the contract, but was expressly authorized by it, and that therefore it was a direct contradiction and perversion of the terms of the contract to the prejudice of appellants for the trial court to instruct the jury that the riding elsewhere than in the caboose was a waiver of the requirement

to ride in the caboose, or might be considered by them as evidence of such waiver. We submit that, by this error on the part of the court, the issue of contributory negligence was, for all practical purposes, withdrawn from the consideration of the jury.

5. It was the duty of the trial court, in defining negligence and in giving the jury the rule by which to measure the degree of care required of appellants, to have instructed the jury that railroad companies are not insurers of the safety of their passengers, further than could be required by the exercise of such a high degree of care and foresight as to possible dangers, and of such a high degree of prudence in guarding against them as would be used by very cautious, prudent and competent persons under similar circumstances. And it was error, therefore, on the part of the trial court, in the fifth paragraph of its charge, in instructing the jury that the law requires railroad companies to exercise a high degree of care for the safety of passengers, and after defining negligence in general terms, to declare that "the exigencies of the particular case dictate and measure the care required." Appellants' contention is, that the use of the term, "a high degree of care for the safety of passengers," without instructing the jury that this degree of care must be with reference to such possible dangers as would be reasonably anticipated by a cautious, prudent and competent person under similar circumstances, does not furnish the jury with any intelligible rule by which to measure the duty which a carrier owes to the passenger. And to tell the jury in the same connection that the exigencies of the particular case dictate and measure the care required, leaves the jury without any rule whatever, and gives them a license to determine for themselves, judged from the retrospective standpoint of the jury box, what the carrier ought to have done. The charge is materially erroneous, therefore, in holding appellants liable under the exigencies of the particular situation, notwithstanding the fact that, by the exercise of a high degree of care, the particular situation could not have been anticipated by a very cautious, prudent and competent person. Railway v. Welch, 86 Texas, 203.

6. The sixth paragraph of the court's charge has no application to the case at bar. As an abstract proposition it is correct, and would be harmless if it did not involve the idea that in this case the defendant companies rested under the same obligations to the plaintiff while riding in the box car with his horse as they did, were he riding in the caboose car provided for human beings.

7. The charge of the court relating to the duty of conductor to notify plaintiff of danger violated the rule which forbids trial courts to enumerate certain facts in evidence, and instruct the jury if these facts are found to exist, they should find a verdict for the plaintiff. Railway v. Murphy, 46 Texas, 356; Railway v. Kutac, 76 Texas, 478; Railway v. Anderson, 76 Texas, 251; Railway v. Dyer, 76 Texas, 159; Dunham v. Lumber Co., 73 Texas, 83.

8. Such charge not only violated the rule in submitting a state of

facts favorable to plaintiff and instructing the jury that these facts would render the defendants liable, without submitting the question whether the jury believed the facts sufficient to constitute negligence, and instead of submitting the puestion as to whether what the conductor actually did was negligent or not, the court takes up a theoretical case and submits to the jury that if they believe that if the conductor had done something else the plaintiff would not have been injured, then they will hold defendants liable.

Whether it was or not the prudence of an ordinary man for the conductor, when the train became stopped, to hasten forward as he did to the cars on which the air brakes were out of order and endeavor to release them, so as to allow the train to move on to a place of safety; whether the conductor was justified in presuming that no accident would befall the flagman and that he would get back far enough to give the proper signals, or whether, in the darkness and confusion and the fact that the plaintiff was riding in a common box car the exact situation of which may have been difficult to locate, and the difficulty and delay of awaking him and others similarly situated; these and other incidental facts and circumstances which must be considered in determining whether the conductor's acts were negligent or not, are not set out so as to present to the minds of the jury the entire situation. Had every hypothesis been fairly and fully submitted, we believe the judge would have thereby invaded the province of the jury; but as only one side of the case was submitted, the charge was clearly argumentative and prejudicial to the rights of defendants and demands the reversal of the case. N. Y. and Texas Ld. Co. v. Gardner, 25 S. W. Rep., 739.

9. The court erred in refusing defendants' special charge No. 4, because, under the facts in the case, defendants' were entitled to have submitted to the jury distinctly the question of whether the failure of the flagman to get back far enough to signal the approaching train was the result of an accident to the said flagman in falling through a bridge, and the jury should have been instructed upon this point, as set out in said special charge.

10. The verdict of the jury is excessive, and not supported by the evidence as to the item of damages for personal injuries, awarded to plaintiff, because the proof did not show that plaintiff was incapacitated to follow his business of horse racer; and showed further that he had during the three years since the trial been following said vocation regularly; and the amount awarded plaintiff for such personal injuries was far in excess of a proper and reasonable allowance to him for the injuries sustained.

*J. W. Parker*, for appellee. 1. Appellants cannot complain of the construction placed upon the provision of the contract by the court below, because it was the very one contended for by them in their answer.

2. Assuming that the construction placed upon the contract by ap-

pellants, namely, that it permitted plaintiff to ride in the car with his horse but imposed upon him any additional risk of doing so, is correct and can be availed of notwithstanding their pleadings, the charge of the court was all appellants could ask; because the court instructed the jury that plaintiff by traveling upon the freight train assumed whatever additional risk that mode of travel involved, and pointedly instructed the jury that if they believed plaintiff, by riding in the car with his horse, was guilty of contributory negligence, to find a verdict for defendants.

3. If plaintiff was rightfully in the car, as admitted by appellants, and as conclusively shown by the evidence, his right to recover would not depend upon whether the car in which he was was as safe a place as the caboose, but whether his injuries sustained where he was were the direct and proximate result of negligence on the part of defendants and without contributory negligence on his part; and his right to recover was distinctly put upon this ground by him in his pleadings and by the court in its charge; and it is well established law that a common carrier cannot by contract shield itself against liability for damages caused by its negligence. Railway v. Harris, 67 Texas, 169; Railway v. Wilson, 79 Texas, 376.

4. The special charge was not a proper one for the reasons, (1) it did not conform to the defendants' pleadings; (2) it did not require the jury to find that plaintiff's injuries were the direct and proximate result of the increased danger, if any, of riding in the car with his horse; (3) because had it been given, it would have authorized the jury to find for defendants, even though they believed plaintiff's injuries were caused by the negligence of appellants and without contributory negligence on his part; (4) because it made it the duty of the jury to find a verdict for defendants if they believed plaintiff would not have been injured had he remained in the caboose, thus ignoring the question of his right to be in the car with his horse, it being clear that if plaintiff, as admitted by appellants, and as conclusively shown by the evidence, had a right to be in the car with his horse, his right to recover could not be tested by whether he would have been injured had he been in the caboose; and (5) it wholly ignored plaintiff's right to recover because of the alleged negligence of the conductor in failing to warn plaintiff of the danger. Railway v. Wilson, 79 Texas, 376.

5. To take the view that the provision of the contract gave plaintiff a right to ride only in the caboose, as plead by defendants in their answer, still the proof conclusively shows the provision was waived by the conductors who had charge of the train in the course of the journey by permitting plaintiff to ride in the car with his horse; and that the conductors had authority to waive the provision is conclusively shown by their invariably permitting the shippers of race animals under contracts containing the same provision to ride in the cars containing their horses. Opinion in this case on former appeal, 8 Texas Civ. App., 378;

Hull v. Railway, 66 Texas, 620; Railway v. Dickson, 32 N. E. Rep., 380; Ins. Co. v. Norton, 96 U. S., 240.

6. The fifth paragraph of the court's charge, relating to the duty of conductor to notify plaintiff of danger, stated the correct rule of law, and it is a familiar principle that the care to be used is measured by the exigencies of each particular case. It cannot be said to have been error, under the particular facts of this case, for the court to fail to instruct the jury that the "degree of care must be with reference to such possible dangers as would be reasonably anticipated by a cautious, prudent and competent person under similar circumstances," because the danger of the rear train running into the forward one would have been apparent to any person of ordinary prudence and was apparent to the conductor as shown by his words and conduct on the occasion in question.

That question of negligence is to be determined by facts of each particular case. Railway v. Greenlee, 70 Texas, 562; Railway v. Smith, 87 Texas, 352, 355.

That conductor must have anticipated danger. Railway v. Lempe, 59 Texas, 22.

7. The objection to the charge defining negligence is not well founded. Appellee was a passenger for hire on the train, and defendants rested under obligation not to injure him by negligence. Railway v. Ivy, 71 Texas, 411; Railway v. Aiken, 71 Texas, 378, 379; Railway v. Garcia, 62 Texas, 288; Railway v. Lockwood, 17 Wall., 357; Railway v. Horst, 93 U. S., 291; s. c., Law Rep. Ann., 23, 899.

8. The charge of the court relating to the duty of conductor to notify plaintiff of danger does not enumerate certain facts in evidence and instruct the jury that if they found those facts to exist they should find a verdict for plaintiff, but requires the jury to first find certain enumerated facts, which was in the interest of defendants, and then to further find before they could return a verdict for plaintiff that it was the duty of the conductor as a man of ordinary care and prudence under the circumstances, to warn plaintiff, and that had he been warned he would have escaped without injury. The charge was more unfavorable to plaintiff than it need have been. The law would have been satisfied had the court simply instructed the jury to find a verdict for plaintiff if they found from the evidence that it was the duty of the conductor as a man of ordinary care and prudence under the circumstances to warn plaintiff of the danger, and that had he been warned he would have escaped without injury; and certainly it cannot be said that the charge was in the interest of plaintiff because it required the jury in addition to find certain enumerated facts. Railway v. Lankford, 88 Texas, 499.

9. Such charge did not preclude the jury from taking into account the facts enumerated by defendant in determining the question of the negligence of the conductor, for, after being required to find the facts enumerated in the charge, which was clearly in defendants' favor, they were further required to find that it was the conductor's duty "as a man of ordinary care and prudence under the circumstances" to warn plaintiff.

The language "under the circumstances" was broad enough to allow the jury to take into account every fact enumerated by defendants' counsel, and for that matter every one that could be conceived by the jury as properly having a bearing upon the action of the conductor. But, even if this were not so and there were hypotheses of fact not embraced in the charge, the existence of which might have warranted the jury in finding the conductor free from negligence, it was the duty of defendants to have requested a special instruction presenting the same, failing in which they cannot complain of the omission. Railway v. Lankford, 88 Texas, 499 (31 S. W. Rep., 356).

10. The charge requested was not proper to be given, because it made the defendants' liability wholly to depend upon whether the flagman failed to get back far enough because of misadventures and entirely left out of view the question whether the trains were not run too close together or in improper order, and completely ignored the question of defendants' liability because of the failure of the conductor to warn plaintiff of the danger, which was specially plead as a ground of recovery by plaintiff.

11. The evidence showed that plaintiff sustained personal injuries of the gravest character, rendering him partially impotent and wholly disabling him from getting about except on crutches, and the verdict is not excessive.

12. Plaintiff having received his injuries in a collision while a passenger for hire on a train operated by defendants, the burden of showing that such collision was not the result of any fault or neglect on the part of defendants rested upon them; and they wholly failed to account for the collision upon any reasonable hypothesis consistent with the use of the high degree of care incumbent upon them, or to rebut in any degree the prima facie case of negligence made against them, and plaintiff was entitled to a verdict, notwithstanding any error there may be in the court's charge. Railway v. Lauricella, 87 Texas, 279, 280; Railway v. Smith, 74 Texas, 278; Railway v. Wilson, 79 Texas, 374; Railway v. Miller, 79 Texas, 82, 83; Pierce on Am. Ry. L. (1st Ed.), 492, 498; Kelly v. Jackson, 6 Peters, 631, 632; Railway v. Mitchell, 21 S. W. Rep., 883.

COLLARD, Associate Justice.—This suit was brought by appellee to recover damages for personal injuries to himself and for killing his horse resulting from a rear end collision of freight trains, plaintiff riding in the car with his horse on the front train.

Upon trial and verdict for plaintiff for $500, the value of the horse, and $10,000 for his personal injuries, judgment was rendered for him from which the railway company has appealed. The case was before this court on appeal once before and will be found reported in 8 Texas Civ. App., 376 (27 S. W. Rep., 769 to 772), to which we refer for a better understanding of the issues now before us.

The facts are briefly as follows: Plaintiff lived near the town of

Lampasas, Texas, and was twenty-six years old, and at times kept and raced fine race horses. He attended the fair at Dallas in the fall of 1891 with a fine race horse, attending the race with the horse whose value is sued for. On November 3, 1891, desiring to return home, he shipped the horse on defendants' cars from Dallas to Temple, Texas. The horse was put in the car to himself. He signed a contract with defendant for the shipment of the horse after the horse had been placed in the car and the train was about to "pull out." He kept the contract and a first-class passenger ticket for his own transportation which he had previously bought at Temple. The rules of the company were that when only one horse was shipped the owner or person accompanying the same had to purchase such ticket. He then went to the car where his horse was already placed; found a man waiting there who asked him for his contract, which he exhibited with his ticket. He also met another person there who called for his transportation, which he again exhibited, and of whom he asked if the ticket was all right. The answer was "Yes;" and he was told to get in. He got in the car with the horse and closed the door and in a few minutes the train "pulled out," he riding in the car with his horse. After arriving at Waxahachie he was again asked by the conductor for his transportation, when he again exhibited the ticket. The conductor after examining it handed it back to him. Between Waxahachie and Hillsboro two men got in the car. At Hillsboro the crew of the train was changed. After the train passed Waco the conductor came around and called for his transportation again. He showed the contract and ticket. This was in the night time and the conductor had a lantern. The conductor handed him back the contract and kept the ticket. Plaintiff was at this time, and had been all the time, in the car with his horse. Between Waco and Temple, about 2 o'clock at night, while this train was stopped, it was run into from the rear by another train, and the car in which plaintiff was riding with his horse was crushed to pieces, the horse and four persons beside plaintiff riding therein were killed, and plaintiff was injured as alleged in his petition, because of which he incurred expenses as alleged. The horse was shown to be worth $500 or more. The train was a freight train divided into two sections; the train was numbered 101 and the sections were called sections first 101 and second 101; plaintiff was riding on the first section, in the second car in front of the caboose. These sections were, by the practice and custom of the company, required to keep at least five minutes apart, and at that time there was a bulletin of defendant ordering freight trains not to exceed twenty-three miles an hour, and the distance between sections of freight trains running at that speed would be about two miles. The second section overtook the first at Grandview, Hillsboro, West, Eddy and Waco stations. The second section came up behind at Eddy about ten minutes after the arrival of the first section and it was not seen again by the conductor of the first until it ran into it. In running section one over a curve, the conductor from the cupola observed fire flying from the wheels and knew, he says, that

the brake "was setting and the air was being stuck;" that is that the brake was tightening. "Turning the cock on the last air car, bursting a pipe, or breaking in two will do it." He saw the train would stop; "the air stuck and was locking the wheels and the train was beginning to stop." The first thing the conductor did was to tell the brakeman to get his red light and go back and flag the second section, and he, the brakeman, got off and started back. The train was going, as the conductor testified, fifteen or eighteen miles an hour when the brakeman got off, and after this the train went on some seventy-five yards, when it stopped. The conductor woke up the occupants of the caboose, and went forward to the head brakeman to see if he knew anything about the air; he got about to the third air car (the air cars are next to the engine) and was looking over them to see what was the matter with them; had bled two to see if it released the brakes, and while he was bleeding a car he heard the engineer and fireman or brakeman say, "Here they come and they are going to hit us." He, the conductor, looked back and saw the second section of the train coming, and it was about one-quarter of a minute from that time until it struck. Nobody was hurt in the caboose; the platforms were knocked off it, and it was knocked off both tracks and its trucks. The engineer of the second section could only see the first section after he got about half way into the cut where the first section had stopped. There was a curve there and he could have looked across and seen it. It was a custom of defendant to allow persons in charge of fine horses to ride in the same car in which the horses were shipped to take care of them.

There was a stipulation in the contract of shipment of plaintiff's horse, "That the person or persons in charge of said stock under this contract shall remain in the caboose car attached to the train while the same is in motion; and that whenever such person or persons shall leave the caboose car or pass over or along the cars or track, they shall do so at their own risk of personal injury from any cause whatever." This clause of the contract was pleaded by defendant in its answer.

Plaintiff was in charge of his horse under the contract. Plaintiff read in evidence the following rule issued by defendant company to its train employes, and in force at the time of the collision:

"Rule 22. When a train from any cause has to stop on the main track in such a position as to endanger it from approaching trains it must be protected by torpedoes and red signals in the following manner: Flagman will place one torpedo on the rail at least twenty telegraph poles from his train; place one torpedo on the same rail at a further distance of ten telegraph poles from the first torpedo, and then take such position about midway between the two torpedoes to stop the train with red signals. Rule 121. Freight trains in sections, or running near each other in the same direction, must keep five minutes apart, except on approaching meeting points, when they will run very carefully, and with trains under control."

Stalker was the brakeman sent back by the conductor to flag the

second section of the train. He noticed the fire from the wheels that had the air on them next to the engine. This caused a jar and the slowing up of the train, and the conductor instructed him to get a red light and go back to flag the second section of the train. He got down as quickly as he could, the train running about fifteen miles an hour, as he testifies. He took along torpedoes, a white light and a red light,—got off by the rear steps of the caboose. As he got off, the bank being steep, he slipped and slided down about twenty feet, but got up as quickly as he could and got back on the track and ran as quickly as he could to stop the second section. He also fell into a wooden bridge, but recovered himself and got up. He skinned himself on the bridge and scrambled over the bridge; ran back as hard as he could, and got very near ten telegraph poles (as near as he could remember). This carried him about the center of the cut, it being a deep cut. When he reached this point he saw the headlight and the engine was at this time at the north end of the cut, the cut being, as he says, about twelve car lengths. He could not tell the rate of speed of the train. He swung the light across the track and the engineer called for brakes by a whistle—one short whistle—and he heard the reversal of the engine. He says the only time he lost was when he slipped and fell through the bridge. He did not return, but went on to flag the passenger train that was following this section of the train. He got about three-quarters of a mile when the rear brakeman of section two came back and relieved him for the purpose of flagging the passenger train. He says that when he saw the engine of the second section it was about ten telegraph poles from the caboose of section No. 1. Section two was a coal train of eighteen cars. It was not supplied with air brakes. He says it was impossible in the distance between the two sections to stop section two from the time he signaled it before it struck the caboose, without air brakes. From thirty to thirty-two telegraph poles make a mile, so he was nearly one-third of a mile back from the caboose when he flagged the train. He says he was about two minutes, after he left the caboose, before he saw the rear section of the train; was not certain that it was not as much as five minutes, but testified that two and one-half minutes nearly cover the time. But he does not swear that the time is accurately fixed.

The foregoing are all the facts that need be stated at this time. We will state any other facts necessary in discussing the issues raised by the assignments of error.

*Opinion.*— Appellant contends on this appeal, as it did on the last trial, before the court below, that the written contract permitted the plaintiff to ride in the car with his horse, but that he agreed to assume all risk of riding elsewhere, and therefore that the court below erred in admitting testimony showing that it was the custom and practice of defendant to allow persons in charge of fine horses to ride in the car with them, as such testimony would be immaterial; and that the court erred in instructing the jury that the object of such testimony was to

show that the provision of the contract relied on by defendant, as to riding in the caboose and assuming the risk of riding elsewhere, had been waived; and that the court erred in not giving instruction asked by defendant, to the effect that the legal effect of the contract required him to ride in the caboose, and that if he saw fit to ride in the car with his horse, and it was more dangerous than riding in. the caboose, he assumed the risk, and that if he had remained in the caboose and would not have been injured, the jury should find for the defendant.

1.   We think our former opinion correctly states the law as to the custom of permitting parties, situated as was the plaintiff, to ride elsewhere than in the caboose, in violation of the contract, and we refer to that opinion on this subject.   We then held that the testimony as to the custom was clearly admissible to show a waiver of the contract prohibition to ride elsewhere than in the caboose.   The testimony was admissible, notwithstanding the construction of the contract by defendant that it expressly allowed the plaintiff to ride in the car with his horse.   Indeed the charge requested by defendant construed the contract to mean that it required plaintiff to ride in the caboose.   We therefore think it was not error for the Court to advise the jury that the testimony of custom was admitted for the purpose stated.   We also think defendant cannot consistently contend that plaintiff was permitted by defendant to ride in the car with his horse, and yet that if he did so, defendant would be relieved of liability for his own negligence in case he availed himself of the permission.   The contract, taking its provisions together, amounted to a prohibition of riding elsewhere than in the caboose, and this prohibition might have been waived by the consent of the company permitting the thing prohibited.   Custom showed this consent or waiver.   It could not be said that, if the company could have been present in person, and being so present, consented to plaintiff's riding in the car. with his horse, it would not have waived the contract prohibition.   In the management of its affairs it could have legally waived the contract stipulation, and having done so, it cannot say that plaintiff assumed the risk of doing so from every cause.   It cannot in such case be heard to say that it would be relieved from its own negligence.   The position of appellant on the point, it seems to us, cannot be approved by the courts.

2.   It is insisted by appellant that the court below erred in the fifth paragraph of its charge in not limiting the care demanded of the carrier to the highest degree of care consistent with the practical operation of railroad trains.   The charge of the court only required the company to use ordinary care and the court did not say a word about the highest degree of care.   The court's charge expressed a correct principle of the law after defining ordinary care in stating that "the exigencies of the particular case dictate and measure the care required."   Defendant requested a charge which limited the care of the company to the highest degree of care consistent with the practical operation of its trains. Defendant cannot complain of the court's refusal to give the charge

as it was more onerous on it than the charge given by the court. The charge given only made defendant liable for its failure to use ordinary care. The court's charge was correct and needed no explanations as asked by defendant.

3. The fourth paragraph of the court's charge is as follows: "You are further instructed that if you believe from the evidence that when the train in which plaintiff was riding came to a stop that there was danger of the same being run into by the second section, and that plaintiff's life and limbs were thereby put in peril, that the conductor in charge of the said train knew of the said danger and of the said peril to plaintiff, if any, or as a person of ordinary care and prudence should have known of the same, and you believe that plaintiff was ignorant of any such danger, if any, and had not equal means with the defendant, The Missouri, Kansas & Texas Railway Company, and with said conductor of knowing thereof, and you believe that said conductor, after he became aware of said danger and peril to plaintiff, if he became aware thereof, or after he should have become aware thereof as a man of ordinary prudence, had ample time by the exercise of reasonable effort to warn plaintiff of the said danger, and you believe that as a man of ordinary care and prudence under the circumstances, it was his duty to warn plaintiff, and you believe from the evidence that had he warned plaintiff, plaintiff would have escaped without injury, you will find a verdict for the plaintiff, even though you may believe he was violating said provision of the contract by riding in the car with his horse, or that by riding therein he did that which a man of ordinary care would not have done under the circumstances. By ordinary care, as herein used, is meant the care and prudence which a person of ordinary care and prudence would have used under the same or similar circumstances."

This charge is objected to because it is said to be a charge upon the evidence, and directed the attention of the jury to particular evidence presenting a theory of plaintiff as to defendant's liability; that it instructed the jury that the conductor was required to notify plaintiff of the fact that the train had stopped without regard to the question of whether the failure to warn was negligence and that it was erroneous in that it instructed the jury that the state of facts therein set out would constitute negligence as a matter of law.

We do not believe any of the objections made to the charge should be sustained. If plaintiff were guilty of negligence in riding in the car with his horse and the conductor knew it, or ought to have known it by the exercise of ordinary care, and his position was one of peril under the circumstances, and the conductor knew this fact and the plaintiff did not know it, it was the duty of the conductor to use ordinary care to warn him of his danger; and if by so warning him, plaintiff would not have been injured, defendant would be liable for the injury. This was a separate and distinct ground of recovery set up by plaintiff in his petition and it was proper to submit it to the jury. The charge was not subject to the criticism that it selected par-

ticular parts of the testimony as a subject of recovery.   The testimony warranted the charge.   The conductor did know that plaintiff was in the car with his horse, and in that position he was in imminent danger, a fact that the conductor ought to have known; and the testimony warrants the conclusion reached by the jury that if he had been warned in time he would not have been injured.   That he was injured there can be no doubt, and this was a result of his being in the car with his horse.   There is no conflict in the testimony upon this point.   The conductor warned other persons in the caboose and the jury were clearly right in finding that if he had also warned plaintiff and had ample time to do so, he would not have been hurt.   The court did not charge that the facts stated would be negligence.   The charge carefuly advised the jury that it was necessary to find the conductor was not exercising ordinary care, in knowing the danger and in failing to warn the plaintiff, to justify a verdict for plaintiff on this branch of the case.   The charge was the law as to proximate cause, telling the jury that they must find that plaintiff would have escaped without injury if he had been warned before defendant would be liable.   There is, however, no objection to the charge as to proximate cause.   The charge was not erroneous as stated in the assignment of error addressed to it.

Defendant asked the court to give the following charge, which was refused:   "That if you believe from the evidence, that the accident of the second section by which the plaintiff was injured, if injured in the accident, was the result of the flagman not getting back far enough to give the proper signal to the engineer of the second section, and if you believe that the failure of the flagman to get far enough back to give the proper signal, was the result of his falling into or through a bridge, and that in so falling there was not any want of care on his part under the circumstances, then you are instructed that if the accident was the result of such failure of the flagman to get far enough back, and was not from any other cause, the defendants are not liable in this case."

In our opinion the testimony did not warrant the charge.   When he got off the caboose the flagman fell down the embankment about twenty feet, "but," he says, "I got up as quick as I could and ran back," etc.   "I also fell into that wooden bridge, but recovered myself and got up.   I skinned myself and scrambled over the bridge and ran back as hard as I could and got north very near ten telegraph poles as near as I can remember."   Again he says in another part of his testimony: "The only time I lost was when I slipped and fell through the bridge." The conductor testified that "right at the wreck, Harry Dane (the locomotive engineer of section two) asked me why I did not have the flagman back farther, and I says, 'How far back was he?' and he says, 'He was not back over ten, I think ten telegraph poles,' and I asked Stalker why he was not back further and he said when he got off he slipped and fell down the dump, there is a little dump of six or eight feet, and when he started to run back he fell into a little bridge, and then got up and

started from the bridge on a run, and he got right back in the edge of the cut." It is not shown that any appreciable time was lost by the brakeman at the bridge upon which the charge asked could have been based. Some time must have been lost in slipping down the embankment, twenty feet, and in getting back on the track. The stumbling into the bridge could not have been the only cause of the accident. The testimony would have authorized the conclusion that the second section of the train was running too close to the first section; or the negligence of the company may have consisted in failure to have the air brakes of the first section of the train in repair, or in failing to move it on out of the way after bleeding the cars provided with air brakes. At all events, we are satisfied the testimony does not indicate that the time lost by the brakeman in getting over the bridge should be made the sole cause of the collision, and it would not have been proper to submit the question to the jury. No witness estimates the time, and the circumstances do not indicate that the collision should be attributed solely to trouble in crossing the bridge, a "little bridge." The general charge of the court that plaintiff must show negligence of defendant causing the injury before he could recover was sufficient. The defense could not under the testimony rest solely on the time lost at the bridge by the flagman, and the court should not, by giving the charge asked, have intimated to the jury that they could so find the fact.

5. Appellants ask a reversal because the verdict is excessive and not supported by the evidence as to the item of damages for personal injuries, "Because the proof did not show that plaintiff was incapacitated to follow his business of horse racer, and showed that he had during the three years since the trial been following said vocation regularly; and the amount awarded plaintiff for such personal injuries was far in excess of a proper and reasonable allowance to him for the injuries sustained. "All the facts were before the jury and we think they abundantly sustain the verdict. We will not presume that the jury failed to give due consideration to facts tending to show the ability of plaintiff to engage in horse racing as he had done before his injuries. Plaintiff testified: "I was lying down in the car where my horse was. I suppose it was between two and four in the morning. I had been asleep and was probably dozing. I found myself thrown with pieces of timber that were flying and sliding together down the embankment. The car I was in was crushed to pieces, all broken up. There were four other persons in the car; they were all killed. I think there was one car between my car and the caboose, and the length of the car was thirty-four feet. There was about thirty-four feet intervening between the car I was in and the caboose. I was thrown with the pieces of the car, the horses, men and all; we seemed to slide down the embankment under timbers. I could not see anything—timbers were striking me. I was struck on the head, back, legs and all parts of the body; there was scarcely a place on me that was not bruised. The skin was nearly

all knocked off my hands; I got up by climbing till I got on top of the mass. The first thing I saw was the men killed that were in the car with me. It was a few seconds or minutes from the time the car struck till I was out on top of the mass of broken timber of the car. I was bruised on the head, face, hands, back, legs, arms and all over my body. I don't know how I got from the car to the caboose. I became insensible. When I became conscious, the first thing I knew I found myself in the caboose; that was sometime in the day about 7 or 8 o'clock; daylight had come. I don't know how long I remained in the car. At times I roused up and remembered things. I was taken to Temple and from Temple home to Lampasas. From the caboose I was taken to a wagonette by men who lifted me up by taking hold of my legs and body and laid me on the long seat in the wagonette. From this wagonette I was taken to the doctor's office. He worked with me some time; I don't remember how long, nor what he did. There were times when I did not know anything that was done. From there I was sent to the depot in a hack, and carried home on the train. The train reached there in the early part of the night, the next night after the collision. I was carried to a hack from the train and laid on a seat and from there I was hauled home. From the hack I was taken to my room and laid on my bed. I sustained personal injuries in the wreck. My head was bruised. The back of my head was all bruised; part of my neck; my body was crushed and I seemed to be bruised inwardly. I spit blood; my back was wrenched awfully; my legs were bruised—my feet and hands were bruised—there was hardly any skin left on my hands at all. I remained in bed a number of weeks after getting home. Dr. King waited on me. He dressed my wounds, examined me and gave me medicine. He came to see me twice a day for a number of days. As much as two weeks after that he came once a day—occasionally twice a day. * * * I was confined to my bed a number of weeks before I was out at all. It was about six weeks before I was out of bed. After getting out of bed, I was set in a chair several times. For quite a while I would sit up for a few minutes, and then go to bed again. After that I would walk with the aid of crutches. It was three or four months before I got out of the house at all. When I went out it was with the aid of crutches. I have used crutches ever since. Developed soreness in my backbone and pain in my head. I have been spitting blood for a number of months—had a cough and spit blood. It seemed to be the left lung that was injured. * * * My eyesight has been injured. It weakened it. I could not scarcely read at all at night. I can only read for a short time. When I read for any length of time the words run together and glimmer. My eyesight was good before the accident. My lungs and chest were in good condition and my general health was good before that time. I was very strong and active, and had good health, was sound in limb and body and had no infirmity, or deformity. My legs are weakened. I have a feeling of numbness in them, a pin and needle feeling, like

they were asleep, and at times a burning and tingling pain. I cannot direct the movement of my legs as I could before the injury. I cannot walk a step without the aid of my crutches, and have not been able to since the injury. I cannot rise without holding on to something, nor sit down without support. At times my urine seems to collect and I have to pass it right away. If I don't it comes itself. At other times I may go, and feel a desire to go, and it is only a dribbling and don't amount to anything. This was not the case before the accident, but has been ever since. After first lying down at night I often draw water two or three times before going to sleep at all. My sleep is very bad, I scarcely ever rest well. I will sleep one or two hours and then lie awake a long time." Being asked about his sexual powers, he testified that before the accident they were strong, but since has had very little— no desire, or scarcely any; and that there was no impairment of these organs before the accident. He is now scarcely ever well—has been under treatment of doctors since—has paid to them about $300, and has never been free from pain since his injuries. He was before engaged in and was looking after a farm, raising stock, buying and selling horses, and getting them in condition to sell. His average earnings up to that time were about $75 per month, and since he has not been able to pursue any business and has earned "scarcely anything." He has no profession—not well educated—can read and write and make ordinary calculations. The last trial was on the 7th day of January, 1895. He was then 29 years old, past, was born September 24, 1865. Physicians testifying corroborate the statement of plaintiff as to his injuries and show that he has now symptoms of paralysis in his lower limbs and that he will probably never fully recover from some of his injuries. He is not a married man, and lives with his father and family. He attended fairs in the state, with race stock. He entered his horse (that was killed) in the races at the Dallas fair. He sometimes bets on the races and made some bets on the side in the races at the Dallas fair. Has farmed and gardened some on a small scale, and raised fruit. Lived with his father who is 70 years old and head of a family—had other younger brothers, and he had charge of the whole place before his injuries. He was at Dallas at the last fair before the trial.

Our conclusion is that the facts warrant the amount of the verdict. The charge of the court presented the law of the case, was full and clear upon the issue of negligence on the part of the defendant, and contributory negligence on the part of plaintiff.

We find no error in the charge or other ruling of the court below assigned by appellant, and the judgment is affirmed.

*Affirmed.*