BESSIE M. ADAMS, Administratrix, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

CARRIERS: Carriage of Passengers—Reasonable Rules Without
1 Opportunity to Comply Therewith—Negligence. A carrier may

not, even by contract, require the doing of *reasonable* things by a passenger, fail to furnish the passenger *reasonable* opportunity to comply therewith, and then predicate contributory negligence *per se* on a violation by the passenger of the requirements. So held as to a provision in a contract for the shipment of live stock requiring the caretaker to ride in the caboose.

PRINCIPLE APPLIED:  Stock was shipped from Chicago. The contract, of which the caretaker had a copy, provided: (a) That the shipper should load and unload the stock and assume the entire care thereof; (b) that the caretaker could only ride on the train carrying the stock; (c) that the caretaker should ride in the caboose when the train was in motion; (d) that, on leaving the caboose, the caretaker assumed all risk of injury; (e) that the train would not stop or start at platforms or depots, or furnish lights for the caretaker. Stock of other owners was shipped in the same train under identically the same contracts—all requiring caretakers.  The stock was loaded late in the afternoon, and, in making up the train, the car was switched about for some hours, the caretaker remaining in the car with the stock and caring for it.  The train was a "rush" train, and stopped only in yards, and at irregular periods, to set out or take on cars, or to pass other trains.  When the train did stop, the caretaker had no knowledge as to how soon it would start.  The train, of which the caretaker's car was in about the middle, consisted of 29 cars, and left Chicago about dark, at which time a "terminal" caboose, apparently not furnished for passengers, was attached, but without notification to the caretaker.  At some distance out of Chicago, a regular caboose was attached, but again without notification to the caretaker.  At no time did the trainmen notify any caretaker that he must ride in the caboose, or that the caboose was even attached to the train, and *no* caretaker did ride in the caboose.  A hot box set fire to the car in which the caretaker was riding, and he was killed.

*Held*, the act of the caretaker in riding in the stock car, under the said circumstances, did not constitute contributory negligence *per se*.

CARRIERS:   Carriage of Passengers—Caretaker of Stock—Duty to Protect.  The protection due a caretaker in actual charge of stock is in no wise lessened by the act of another person, who was the owner of the stock, in wrongfully or unavoidably remaining in the car with the stock.

1336        ADAMS v. C. R. I. &. P. R. Co.    [179 Iowa

CONTRACTS: Validity—Public Policy—Contracting Against One's
3   Own Negligence. A common carrier may not, even as to inter-
    state commerce, relieve itself by contract from liability for
    its own negligence. So held as to a contract for shipment of
    stock.

COURTS: Jurisdiction—Death in Foreign State—Comity. The
4   courts, of the state have jurisdiction of an action to recover
    for wrongful death occurring in a foreign state, even though
    a contrary rule prevails by statute in the state where death
    occurred.

*Appeal from Johnson District Court.*—RALPH P. HOWELL,
Judge.

WEDNESDAY, FEBRUARY 14, 1917.

REHEARING DENIED SATURDAY, MAY 19, 1917.

ACTION to recover damages for personal injury. Opin-
ion states the facts. Verdict and judgment for the plaintiff
in the court below. Defendant appeals.—*Affirmed.*

*Messer, Clearman & Olsen, F. W. Sargent,* and *J. G.
Gamble,* for appellant.

*Dutcher & Davis* and *Ralph Williamson,* for appellee.

GAYNOR, C. J.—I. This action is
brought by the administratrix of the estate
of one Thomas L. Adams to recover dam-
ages for his death, claimed to have been
caused by the negligence of the defendant.
It appears that one Sam Williamson
shipped six head of cattle to the Interna-
tional Live Stock Show in Chicago, from Iowa City, in No-
vember, 1912, and took Adams along with him to help care
for the cattle. He sold some of the cattle in Chicago and
bought others. On December 8th, the live stock show hav-
ing terminated, Williamson, intending to ship these cattle
and some others back to Iowa City, went to the office of
the defendant company in Chicago to make arrangements
for shipping them home. He got the same car in which

1. CARRIERS:
carriage of
passengers:
reasonable
rules with-
out oppor-
tunity to
comply there-
with: negli-
gence.

the cattle were shipped to Chicago. He entered into a written contract with the defendant company for the shipment of the cattle. This was the ordinary live stock contract prepared by the company for use in contracting with shippers for the transportation of cattle. It provided that, for the consideration and mutual covenants and conditions expressed in the contract, it would transport for Williamson certain cattle in a box car. from the Union Stock Yards in Illinois to Iowa City, consigned to Sam Williamson. This contract was executed by Williamson and the company. Among other things, it provided that Williamson should assume all risk, and expense of feeding, watering, bedding, and otherwise caring for the live stock covered by the contract, while in the cars, yards, pens or elsewhere, he to load and unload the same at his own expense and risk; further, that the contract does not entitle the holder, Sam Williamson, or any other person, to ride on any train except the train in which the live stock is transported, and then only for the purpose of caring for such live stock; that the person or persons in charge of the live stock covered by the contract should remain seated in the caboose car attached to the train while the same was in motion, and that, whenever such person or persons should leave the caboose car, or pass over or along the cars or tracks, they should do so at their own risk of personal injuries from every cause whatever; and that the company should not be required to stop or start this train or caboose car at depots or platforms, or to furnish lights for the accommodation and safety of such persons. After this contract was executed by Williamson and the company, one of defendant's employees brought it to the car in which the stock were to be shipped and in which they were housed. Adams was there. Williamson was not there at the time. The contract was handed to Adams, the party supposing it was Williamson. This was brought for the purpose of having

the following provision on the back of the contract signed:

"We, the undersigned, owners, or in charge of the live stock mentioned in the within contract, in consideration of the free passage granted us by the Chicago, Rock Island & Pacific Railway Company, hereby agree that said company shall not be liable to us for any injury or damage of any kind suffered by us while in charge of said live stock or on our return passage."

As said before, the employee of the company presented this to Adams, who was in the car in whch the stock was to be shipped. Adams signed this part of the contract in the name of Williamson. It appears to have been signed in duplicate; one copy was kept by Adams, and the other by the company. When Williamson came to the car, Adams showed him this contract with this endorsement on the back, which Williamson examined and returned to Adams, and Adams retained the contract in his possession. The cattle were loaded at the chutes in the Union Stock Yards, Adams and Williamson helping in the loading, and they both remained with the cattle in the car while it remained in the yards. The cars were switched about in the yards for some hours after they were loaded, presumably for the purpose of making up the train.

It appears from the testimony that it was the purpose of Williamson that Adams should act as caretaker of this shipment. Adams was employed by Williamson to take care of the cattle on their journey from the stockyards to Iowa City. This was a rush freight train—stopped only when occasion required it, to set out or take on other cars, or to let passenger trains pass by. It was a train that stopped in the yards, when stopped at all. It was not required to stop at platforms or passenger depots. The train, after being switched around over the stockyards during the afternoon, left Chicago about five o'clock. It was then dark. The conductor of the train testifies:

"The first stop was at Mokena, 30 miles from the La Salle Street station. The next was at New Lenox, 34 miles; the next at Joliet. We did not stop in the yard. We stopped for the railway crossing at Joliet. The next stop was at Rockdale. We next stopped at Morris, 62 miles from Chicago; then at Bureau, 85 miles from Chicago; then at Utica, 94 miles west; then at De Pue, 110 miles from Chicago; then at Bureau Junction, 114 miles; then within 6 miles of Sheffield."

At Sheffield, the car in which Williamson's stock was shipped was found to be on fire. It was there that plaintiff's intestate received the injuries from the fire that caused his death. When the train left Chicago, it had attached to it what is known as a terminal caboose. The car in which the fire occurred which caused the death was the twenty-second car from the caboose, and seventeen cars back from the engine. It is claimed that the fire was caused by a hot box. That there was a fire, and that it caused the death of plaintiff's intestate, is not disputed. There were ten loads of stock, all from the exhibition, on this train. A regular stockman's caboose was attached to the train at Blue Island or Burr Oak. We will not enter into a discussion of the evidence, in so far as it relates to the negligence of the defendant. There is a sharp controversy upon this issue. There is evidence, however, that the fire that burned the car in which deceased was riding, originated outside the car, and we think the evidence sufficient to justify a finding on the part of the jury that the fire originated from a hot box. So we pass this question to the more serious questions presented by this record.

The contract under which the plaintiff's intestate was riding provided that the persons in charge of the live stock should remain seated in the caboose attached to the train, while the train was in motion. Deceased and Williamson, at the time of the fire, were riding in the car with the stock,

and it is claimed that this fact defeats recovery. That plaintiff's intestate had a right to ride upon this train as caretaker we think is evidenced by the contract itself. The contract provides that it does not entitle the holder thereof, or any other person, to ride on any train except the train on which the live stock is transported, and then only for the purpose of caring for such live stock. The converse of this is that the holder of the contract, or other person, may ride upon the train on which the stock are transported, for the purpose of caring for the stock. It contemplates that some person shall be in charge of the stock, and that some person shall ride upon the train upon which the stock are transported; for it says in the fourth paragraph of the contract that:

"The person transporting stock shall assume all risk and expense of feeding, watering, bedding, and otherwise caring for the stock while in the cars, yards, pens, or elsewhere."

This is a continuing duty, and relieves the company of that which otherwise would be its duty. Thus we have in the contract that the person in charge of the stock shall ride upon the train in which the stock is being transported, and shall care for the stock, feed, water and bed it. We have deceased rightfully upon the train under this contract, and for this very purpose. We assume, therefore, that Adams was rightfully on the train. The next question then is, Did his riding in the *car with the stock* subject him to all risks incident to riding there, and defeat recovery if injured while riding there, because of that other provision of the contract which says he shall ride in the caboose attached to the car?

It has been recognized that common carriers, because of the strict accountability to which they are held for injury to passengers, may make reasonable rules and regulations governing the conduct of their passengers, and en-

force the same for their own protection. And it is true, as a general rule, that, where the company has made reasonably safe provisions for the transportation of its passengers, the passengers cannot, in violation of these rules, assume places of hazard and danger without assuming the risk that is incident to the dangerous positions so voluntarily assumed. We have cases where it is held that one assumes the hazard of his position who rides upon the platform of moving trains, when the company has made provisions for seating passengers within the coach. These are familiar rules, and need no citation of authorities; but they are based upon the assumption that the company's rules are reasonable, and that they have made provision for the accommodation of the passenger without the necessity of exposing himself to the greater hazard. The bottom principle upon which these rules rest, is that the company has a right to make rules reasonable in themselves and for the protection of the company itself against liability; but all these cases assume that the company has made provisions for the safety of the passenger, known to the passenger, and that the incident of travel did not require the exposure to the greater hazard. The general holding is that a passenger who voluntarily occupies places of increased hazard outside the portions of the train set aside for his carriage, and is injured as a result of such unnecessary exposure, cannot recover.

We may assume, for the purposes of this case, that the company had a right to make the rule requiring the caretakers of cattle upon its trains to remain in the caboose while the train was in motion. We may assume that this was a reasonable provision, and one that the caretaker could be required to observe, and we may assume that, if the company had, with the knowledge of the caretaker, provided a caboose in which to ride, the company could have insisted upon his keeping himself within the limits of the

provision, and that he could not rightfully ride on other portions of the train when such provisions were made for him in the caboose. We have, however, in this case, this state of facts: The cattle were loaded at the stockyards early in the afternoon—loaded in this particular car. It was the duty of the caretaker to remain with them and care for them while in the stockyards. To accomplish this, we may assume that it was necessary for him to remain in the car with the stock while in the yards. This car was shifted back and forward during the afternoon while the train was being made up. It was necessary that he remain in the car in order to be with the stock during this time. No caboose of any kind was placed on the train until it left the stockyards; then there was placed on the train what is known as a terminal caboose. It does not appear from the record whether or not this caboose was arranged and furnished for the accommodation of passengers. One witness said it was made to carry supplies, and such as that. The caboose for stockmen was not placed on the train until after it reached Blue Island. The train left Blue Island at 4:55 in the afternoon, and did not stop thereafter until it reached Mokena, 14 miles further to the west. The jury might well find that, during this time, no reasonable opportunity was given deceased to go to a caboose if he had known one to be there. It is not shown that he was ever notified of a caboose; that one had been attached, or when it was attached. It must be borne in mind that this was a rush train; that it did not stop at depot platforms, but in the yards, and then only at such places and for such a length of time as was found necessary in order to take on a car, or to take off a car, or to allow a passenger train to move by. No opportunity was given the deceased—no assurance was given the deceased—that, if he left the car in which he was riding, he could, at any time, reach the caboose before the train moved on. It

appears that there were ten cars of cattle on this train. It appears that the waybills were all like the one under which this stock was being moved. They all, then, required caretakers. The conductor says there were no stockmen or caretakers in the caboose at any time. From this it can well be assumed that the conductor knew that the stockmen or caretakers were on the train, and presumably with the cattle in their charge, or placed in their charge. The conductor gave no notice to these parties, nor to any of the parties, that they were required to ride in the caboose. To an ordinary man it would seem quite as safe from fire or ordinary injuries from the wrecking of a train, etc., to ride with the cattle in a car in the center of a train as it would on any other portion of the train.

Untrammeled by this contract, the jury might well have found that the deceased was not negligent in choosing this particular place in which to ride on the train; that the hazards were not increased; and that the danger incident to riding there was not greater than it would be in the caboose. To defeat the plaintiff in this case, it must be said that this portion of the contract, requiring him to ride in the caboose, was of such binding force that, as a matter of law, he was guilty of contributory negligence in riding with the cattle in the car. Before one can be charged with contributory negligence, or with having voluntarily assumed a place of greater hazard than was involved in the place provided for his passage, it must be made to appear that he voluntarily assumed such position, with an opportunity to avail himself of the place provided. If the company, by its conduct, after providing the place stipulated in the contract for his occupancy, so conducted itself and so arranged its affairs that the deceased could not, without great hazard to himself or to the property in his care, have complied with the terms of the contract, the company cannot be heard to say that the failure to so comply releases

it from the obligation to respond for its own negligence. It placed the conductor in charge of this train,· with power to control and direct its movements. It placed the conductor in charge of the freight. committed to this car. It placed the conductor in charge of and with control over the passengers it assumed to transport.

It appears that, immediately upon the attaching of this caboose at Blue Island, the train proceeded westward, without notice to anyone riding on the train of the fact that it had been attached, without notifying or giving anyone an opportunity to pass from their then location to what the company now insists was the only proper place in which they had a right to be transported. Can it be said, under the circumstances, that the defendant had furnished this caboose for the accommodation of these passengers; .that the passengers were bound to know,· without notice of this fact, and avail themselves of this claimed safer place for transportation, when the company, through the persons placed by it in charge of the train, took no care to notify these people of the fact that the caboose was there at their disposal? The company now insists that it was the only place in which they were authorized, under the contract, to be ,transported. Did the company mean to say to the shipper by this provision of the contract: "You must ride in the caboose .and nowhere else; we will place your car in a long train; you must feed, water, and care for your stock; we will not stop or agree to stop at any particular place so that you may do this, or for any particular length of time; we will not furnish you lights; if you leave your caboose and go to your stock, you assume all the risks and hazards incident to so doing, but we will not insist· upon this provision of the contract unless some accident occurs?"

·   The courts of the country have had to deal with questions similar to the one here. See *Chicago, B. & Q. R. Co. v. Dickson,* (Ill.) 32 N. E. 380. This was an action to re-

cover damages by reason of personal injuries sustained by
a shipper of stock on its road.  The court said:

"The contract of shipment prohibited the plaintiff
from riding in the same car with the horses, and it is
insisted that the court erred in permitting the plaintiff to
prove that in shipping two stallions in the same car it was
necessary for someone to be in the car with the horses; and
also that there was a custom existing between the defendant
company and shippers  *   *   *  that a person might ac-
company the stock, and take care of the same.  We do not
regard the admission of this evidence erroneous.  If the
plaintiff, at the time of the accident, was riding in a car
not provided for passengers such as he was—one where
his presence was not required in order to protect his prop-
erty, and in a car which he was prohibited from occupy-
ing by the company—it might properly be claimed that he
was not in the exercise of ordinary care, and hence guilty of
negligence which might preclude a recovery.  On the other
hand, if it was absolutely necessary, in order to protect plain-
tiff's property, for plaintiff to ride in the car with the horses,
and the company had waived the prohibitory clause in the
contract of shipment, and consented that plaintiff might
ride in the same car with the horses, evidence tending to
prove these facts was competent for the jury.  For the pur-
pose of showing a waiver, the constant practice of the com-
pany to allow shippers of such stock to ride in the same car
with the stock was competent."

See *Missouri, K. & T. R. Co. v. Cook,* (Tex.) 33 S. W.
669.  This was an action for personal injuries received by
a shipper while riding in a stock car with horses shipped by
him.  In that case it was said:

"We also think defendant cannot consistently contend
that plaintiff was permitted by defendant to ride in the car
with his horse, and yet that, if he did so, defendant would
be relieved of liability for its own negligence in case he

availed himself of the permission. The contract, taking
its provisions together, amounted to a prohibition of rid-
ing elsewhere than in the caboose, and this prohibition
might have been waived by the consent of the company per-
mitting the thing prohibited."

To the same effect, see also *Missouri, K. & T. R. Co. v.
Avis*, (Tex.) 91 S. W. 877. It is contended, however, that,
in the case at bar, no waiver was pleaded. However that
may be, we are satisfied that the facts disclosed in this rec-
ord, to which we have adverted, might well have been found
by the jury sufficient excuse for the conduct of the plain-
tiff's intestate, relieving him from the imputation of con-
tributory negligence in failing to comply with the require-
ments of the contract as to the place where he should ride.
He was caring for the stock when the train started. To
care for the stock required him to be in the car with the
stock. He was never notified that a caboose had been at-
tached. None was attached while the car remained in the
yards. The jury might well have found that no reasonable
opportunity was given the deceased to reach the caboose
after the train started—no opportunity that was not in-
volved in peril to himself and to the property left in his
charge. He was rightfully in the car at the time the stock
were loaded, and while the same were in the yards. No
other place was provided by the company for him. It was
made his duty to care for the stock. The drovers' caboose
was not attached until after the train had passed out of
the yards, and this without notice to him and without re-
quest to him to ride in the caboose.

Independently of this portion of the contract, the jury
might well have said that the place occupied by him was
attended with no more hazard than would have been a place
in the caboose. Upon this point see *Illinois Central R. Co.
v. Beebe*, (Ill.) 43 L. R. A. 210. This was an action to re-
cover for the death of a caretaker accompanying stock.

The contract of shipment required the owner to feed, water, and care for the stock at his own expense and risk. It further required that he ride in the caboose attached to the train conveying the stock. In passing upon the question of deceased's contributory negligence in being in a stock car with the stock at the time of the injury, the Supreme Court of Illinois said:

"It is claimed that the deceased was guilty of 'contributory negligence, upon the alleged ground that when injured he was in the car chartered by him, where his horses and household goods were, instead of being in the caboose attached to the freight train. It is true that the contract required the deceased to 'ride in the caboose attached to the train conveying the stock.' But the contract also states that 'the owner will feed, water, and take care of his stock at his own expense and risk.' The contract must be so construed as to be consistent with itself. If the deceased was obliged to feed, water, and take care of his stock, he had the right to go into the car where the stock was, in order to fulfil this obligation. Counsel for appellant claim that while the train was in motion it was the duty of the deceased to be in the caboose, and that only when the train stopped did he have any right to go to his own car to feed and water his stock. The evidence tends to show that when the train stopped at La Salle the deceased was in his own car, and was there engaged in watering his stock, and was assisted in so doing by the conductor and brakeman of the train. While he was thus engaged in feeding and watering his stock, the train suddenly started, and did not again stop until it reached the place where the accident occurred. The stop made at La Salle would appear to have been a very short one, and not long enough to enable the deceased to finish the acts of attention which he was giving to his stock. It was a fair question to be submitted to the jury, whether, under all the circum-

stances, the servants of the appellant in charge of the train did not fail to give the deceased sufficient time to feed and water his stock and return to the caboose before the train started. After the train started, and while it was in motion, it was not possible for him to reach the caboose. It was a question, therefore, for the jury to determine, whether or not the deceased was guilty of contributory negligence in being in the car, and whether or not he was forced to remain there by reason of the conduct of the servants of the appellant, in causing the train to start before he had finished caring for the stock. If there had been no provision in the contract of shipment requiring the deceased to feed and water his stock, it would have been the duty of the appellant to do so, and appellant would have been liable to the deceased for a loss or injury occurring to the stock in case it had failed to discharge this duty. But inasmuch as, by the terms of the contract, the duty of caring for the stock was assumed by the deceased, as the shipper thereof, the appellant was under obligations to afford him a reasonable opportunity and reasonable facilities for doing what the contract required him to do."

In *Florida R. & N. Co. v. Webster*, 25 Fla. 394, the contract required the shipper to feed, water, and care for his horses. The train stopped at a station; he went into the car with the horses for that purpose. The train started before he had finished. The court said:

"Suppose, then, we admit the contention of the appellant that the proper place for appellee when the train was running, was in the passenger car, is there anything in the facts to excuse and justify his presence in his own car at the time he received his injuries? The time was about the usual feeding hour, early in the morning. He had gone into his car to feed his horses at a place where the regular stoppage of the train was 45 minutes; but after stopping only 15 or 20 minutes the train started on its course, while he

was still in the car, his work unfinished. The disaster occurred when the train had run about 5 miles. It is not shown that in this run any opportunity was furnished for transferring himself to the passenger car, and presumably in so short a run there was no such opportunity. Thus we find him in his own car under circumstances in which it was reasonable and proper he should be there, not in fault in being there when he entered, and caught remaining there when, though another car was at his service, he could not help himself. It is hard to conceive that in such a state of facts he was subject to blame for negligence, and we think he was not."

See also *Southern R. Co. v. Cullen,* (Ill.) 77 N. E. 470; *Chicago & A. R. Co. v. Winters,* (Ill.) 51 N. E. 901; *Lake Shore & M. S. R. Co. v. Teeters,* (Ind.) 74 N. E. 1014. In this last case, the train was seventy-five cars in length, with a caboose attached. The train was wrecked while appellant was riding in the stock car with his stock. The contract for transportation provided that appellee should attend to, care for, and feed his stock while *en route,* and load and unload the same. The car in which appellee was riding when injured was the fortieth car back from the engine. The Supreme Court of Indiana said:

"Counsel for appellant have cited a number of cases where the person injured was voluntarily and unnecessarily riding in a place of danger, where a proper place for carrying passengers was provided by the carrier. But we cannot say that the answers to the interrogatories (interrogatories submitted to the jury) show that appellee was voluntarily and unnecessarily riding in the stock car; and, without attempting to state what the rule should be in such cases, it is enough to say that the rule controlling in that class of cases is not necessarily controlling in this case, in so far as the facts are disclosed by the answers to the interrogatories."

The court further said:

"In concluding by their general verdict that the appellee was not guilty of negligence contributing to his injury in riding in the stock car instead of the caboose, the jury had the right to take into consideration, with the other facts and circumstances surrounding him at the time, the location of the car in the train, its distance from the caboose, and the duties required of the shipper by the shipping contract with reference to caring for the stock."

There was no direct provision in the contract requiring the shipper to ride in the caboose, but this was inferentially so; for the contract provided that, when the person accompanying the stock to take care of the same should leave the caboose and pass over along the cars or track, he should do so at his own risk of personal injury.

See *Lake Shore & M. S. R. Co. v. Teeters,* (Ind.) 77 N. E. 599. In this case, the contract provided the same as in the contract at bar, touching the feeding and watering of stock. There was no direct rule in this case compelling the plaintiff to ride in the caboose. At the time of the injury, he was riding in the car with the stock. In that case, it was said that the transportation contract itself was sufficient to charge the carrier with notice that the plaintiff was on its train at the time with his stock, and the failure to account for him in the caboose was sufficient to charge the carrier with notice that he was riding in the stock car. The court said:

"Appellant's counsel cite many cases in which it has been held that passengers who voluntarily occupy places of increased hazard outside of those portions of the train intended for their carriage, and are injured as a result, cannot recover, and it is also contended that the very fact that a caboose is attached to a freight train is notice that the passenger is expected to travel in the car. If a passenger has no business upon other portions of the train, the

rules of law suggested might be applied, but in view of the nature of a stockman's duties and responsibilities, we doubt the application of such rules as to him."

In *Kansas & A. V. R. Co. v. White,* 67 Fed. 481, it was said:

"Stockmen charged with the duty of looking after their stock may  *  *  *  do many things on the freight train, without being guilty of negligence, which, if done by one riding on a passenger train, would undoubtedly constitute negligence."

We hold, therefore, that, under the facts of this case; it was a fair question for the jury whether or not the deceased was rightfully upon the train at the time he was injured, and whether or not, being rightfully upon the train, he was guilty of contributory negligence in riding in the car with the cattle, instead of in the caboose. The court submitted these questions to the jury, and the jury found in favor of the plaintiff. We see no ground for disturbing their verdict upon this point.

II. It is next contended by appellant

2. CARRIERS: carriage of passengers: caretaker of stock: duty to protect.

that, inasmuch as the contract with the company was made by Williamson, and inasmuch as Williamson assumed to ride, under the contract, as caretaker of his own stock, the deceased was not rightfully there, either upon the train or in the car, under the provisions of the contract. This contention, too, must be disposed of upon the facts of this particular case. It is true that the contract with the company was made by Williamson; that Williamson was the owner of the stock; that he rode on the train in the car with the stock from the stockyards to the point where the fire occurred. The record discloses, however, that it was not Williamson's purpose to ride on the train as caretaker of the stock; that he had selected Adams for that purpose, and had placed Adams in charge of the stock under the

contract; that it was his purpose not to ride on the train as caretaker of the stock or to assume any rights of transportation for himself under the contract. He was with the stock at the time it was loaded. He remained with the stock in the yards. When the train left the yards, he claims it was his purpose, as soon as he could avail himself of an opportunity, to secure for himself transportation on some of defendant's passenger trains; to leave this train and secure transportation on a passenger train; that, because of the manner in which the train was moved and stopped, no opportunity was given him to get to a station, with safety to himself, for the purpose of securing transportation on a passenger train; that he remained in the car from necessity, or because it seemed to him to be necessary.

However that may be, the record discloses such a state of facts as would justify the jury in finding that Adams was the caretaker of the stock; that he was riding under the contract providing for a caretaker to accompany the stock; and his rights are not to be prejudiced by the misconduct of Williamson, if any misconduct there was. Williamson did not ride or assume to ride as caretaker. The contract provided that a caretaker should be transported with the cattle. He had transferred this right to Adams, and Adams was riding under the contract giving to him this right to be transported as caretaker. We see no ground for imputing any wrong to Adams that would relieve the company from responsibility. Adams was on the train as caretaker of this stock, under the contract, with the consent of Williamson; and, as said before, it was for the jury to say, under the facts of this case, whether he was guilty of contributory negligence in riding in the car with the stock instead of in the caboose. The contract itself granted free passage to a caretaker. It required certain duties and responsibilities of the caretaker—to attend to the stock while on cars, feed and water the same. The contract was suffi-

cient to charge the company with notice that a caretaker was on the train in charge of the stock. A failure to account for him in the caboose would naturally lead to the inference, in view of the duties and responsibilities resting upon a caretaker, that he was on some other part of the train, and naturally the inference would be that he was in charge of the stock, the care of which was imposed upon him by the contract. Upon this point see *Lake Shore & M. S. R. Co. v. Teeters,* (Ind.) 77 N. E. 604.

**3. CONTRACTS: validity: public policy: contracting against one's own negligence.** Something is said in argument to the effect that the company is released from liability because of the stipulation on the back of the contract providing that "the undersigned owners in charge of the stock, in consideration of free passage, agree that the company shall not be liable for injury or damage of any kind suffered by us while in charge of the live stock." Why this provision was inserted, in view of the repeated holdings of the courts that a common carrier cannot relieve itself by contract from liability for its own negligence, we cannot discover. It seems to be urged that, under the Carmack Act, those engaged in interstate commerce may make rules with the shippers limiting liability. Of course, they may make certain rules limiting liability, but not such as to relieve them from the consequences of their negligence. They may limit the amount of damages that may be recovered for loss or negligence, or injury to freight; they may limit the time in which actions may be brought under contracts; but the authorities do not hold that they can contract against any liability for negligence. They cannot contract against liability for the consequences that follow a violation of their common law duty in transporting passengers. We hold, therefore, that this provision on the back of the contract is void and against public policy. See *Buckley v.*

*Bangor & A. R. Co.*, 113 Me. 164 (L. R. A. [N. S.] 1916A, 617) ; *Solan v. Chicago, M. & St. P. R. Co.*, 95 Iowa 260.

**4. Courts: jurisdiction: death in foreign state: comity.**

It is next contended that this action cannot be maintained in this state for the reason that the act that caused the death occurred in Illinois, and that, under the Illinois statutes, no action for wrongful death occurring outside the state can be brought or prosecuted in the courts of Illinois. It is then urged that, under the rule of comity, this court will not assume jurisdiction where the wrongful death occurred outside this state. There is nothing in the statutes of this state prohibiting a citizen of this state from maintaining an action in the courts of this state to recover damages for a death resulting from a wrongful act occurring outside the state. It is the general rule at common law, and it is the rule in every state, in the absence of a statute to the contrary, that, a right of action having accrued, it may be pursued in any court that has jurisdiction of the subject matter and can obtain jurisdiction of the parties. As said in *Johnson v. Chicago & N. W. R. Co.*, 91 Iowa 248, quoting from the Supreme Court of Pennsylvania :

" 'The statute of another state has no extraterritorial force, but rights under it will always, in comity, be enforced, if not against the policy of the laws of the forum.' "

We think there is nothing in this contention of the defendant's. This court had jurisdiction of the subject matter of the parties, and the statutes of Illinois had no extraterritorial force.

Some complaint is made by appellee of the manner in which defendant presented this case to the court. We pass this by with the remark that all the matters raised by the additional argument filed after appellee's argument was filed, were, we think, fairly within the record as presented in the original argument—at least we have so treated them, preferring to dispose of the case upon the merits of the con-

troversy. We find no ground for interfering with the action of the court below, and the cause is—*Affirmed.*

LADD, EVANS and SALINGER, JJ., concur.